Good morning, Your Honor. Kelly Quinn, appearing on behalf of Appellate James Michael Jerra. Appellate raises several issues in the briefing which we assert show that he was not afforded a fair trial. Most relevantly, the admission of character evidence, the limitation on defense cross-examination, and most notably, the exclusion of every piece of defense evidence. Counsel, let me candidly confess to you that I found many of your points entirely persuasive. It didn't seem like a fair trial to me, frankly. The government's witness was made out to be a saint. Your client was made out to be an unrepentant, total sinner. And the evidence that was allowed in or kept out was shaped to accomplish that as far as I can tell. I also can't see any prejudice. Your guy's stories were so ridiculous and self-contradictory and changing. I can't see how any jury could have convicted, could have acquitted him of anything after hearing his stories. What's the prejudice? Well, Your Honor, first I would like to say even with the exclusion of every piece of defense evidence, the jury still came back initially hung. So the story in this case, for example, the first piece of defense evidence, which would have been the contract between Mr. Jarrah and Mr. Mandeville. Now, the critical evidence is he puts in these phony tax returns to get huge undeserved tax refunds, and then he tells all these crazy stories. Oh, I was working really late, and it was a pro forma, and my wife sent it in by mistake, and I corrected it, but he didn't correct it until months later. That's the part of it that strikes me as critical. Well, Your Honor, there are three counts. The first two counts would have been for the corporate returns, and the third count, which would have been what Your Honor was discussing, would have been for the personal tax returns. That makes him out to be such a phony that it taints the corporate returns. Well, certainly we were also he was also excluded from presenting evidence that he had attempted to that he had amended the returns. The jury did not get to see the amended returns that he submitted in September of that same year. The jury didn't get to see evidence of what the actual intended return was. Does anything matter except that it was September? Well, certainly evidence of what the intended return, the return he had intended to submit would have been relevant. It would have gone to show that he had no intent to defraud the government. If you wake up after work until 5 in the morning and you discover, oh, my God, my wife sent in the pro formas that were just fantasy, I better get this fixed right away. Well, he was not aware right away that the incorrect tax returns had been filed. It wasn't as though he woke up the next day and said, oh, this incorrect tax return was filed. Let me fix it. He didn't find out until months later, until after he contacted the IRS for the third time, that there was some kind of problem with the return. They let him know what the problem was, and then he worked to fix it. But none of this evidence was presented to the jury. The jury didn't get to see the actual intended return. The jury didn't get to see the amended tax return for the personal returns. So he didn't find out until months later that this crazy pro forma return had been sent in? That's correct. Until he spoke. He didn't print out one for himself, put it in his file, show it so that he could know what the action was? Well, he had several personal pro forma returns on his computer. So he had printed out what he believed was the intended tax return, and he had that, and he tried to introduce that into trial, but the lower court wouldn't allow it. So, right, it wasn't until the first two times he spoke with the IRS. He didn't find out, and when did he do something about it? Well, he found out, I want to say it was in April. He then, as came out in trial, around that time his ex-wife's mother passed away. They went to Florida. There was some evidence at trial. They spent a few months there dealing with the funeral arrangements, getting her affairs in order. He came back. It's September. It's corporate tax return time. He files corporate tax returns and his own amended return in October. So any evidence that he attempted, though, before this ---- He was just too disturbed by the death of his ex-mother-in-law between April and October to do anything about this? Well, yes. He was not in Nevada or California. They were in Florida dealing with the funeral arrangements and the estate and all that goes along with that. And the amended return was, of course, in evidence. The amended corporate tax returns were not in evidence. Those were excluded. His ---- the intended personal tax return was Defense Exhibit 105, and that was not admitted. The amended ---- But what was admitted in terms of an amended personal return? What the government would have admitted, I believe the government did admit the amended personal tax return but did not admit the amended corporate tax returns, which were counts one and two. Ms. Quinn, why isn't there any documentary evidence to support the existence of checks purportedly totaling $10 million? Well, Your Honor, the lower court kept out eyewitness testimony by ---- Talk about documentary evidence. Well, there was no documentary evidence. There was none that was attempted to be brought into evidence. Those checks were sent to Mr. Mandeville. So Mr. Jarrett did not retain those checks. They were sent off. The Court, however, did exclude the eyewitness testimony of the ex-wife that she had viewed the checks. But there was no other evidence of the checks. Is there anything to support an alleged contract between Leatherwood and your client? Well, Ms. ---- The appellant attempted ---- Or is there any written evidence? There was. That was Defense Exhibit 101, which was excluded from the lower court. That was an employment contract between Mr. Jarrett and Mr. Mandeville that would have went into what the relationship was. In addition, there was Defense Exhibit 110, which was a copy of the schedule listing the payroll taxes. Both of those were excluded by the lower court based on what it believed was a best evidence rule, which did not account for 1003 allowing a copy to be treated as original. The lower court excluded both the employment contract and the schedule of payroll taxes because it believed that Mr. Jarrett had to show the original was unaccounted for, even though Mr. Jarrett testified that what he had was a true and correct copy of the original. I thought he wasn't trying to prove the truth of the fact that the terms of the contract at all. He was just trying to prove that he believed that he had one. That's correct. He was trying to prove that there existed a contract. However, the lower court excluded based on best evidence. I thought he was just trying to prove that he believed that there existed a contract. No. He was trying to prove there was a contract. He believed that there was a schedule for payroll taxes to be sent into the IRS by Mr. Mandeville. But both of these key pieces of defense evidence, which would have shown the jury that there was a relationship between Mr. Mandeville and Mr. Jarrett, were excluded based on this incorrect notion that the lower court had of best evidence. The lower court also refused to admit the amended corporate tax returns, the evidence of the checks. Every piece of defense evidence was excluded by this lower court. In addition to excluding every piece of defense evidence, the court allowed government's witness, Mr. Leatherwood, to testify as to several issues concerning Mr. Jarrett's character. Mr. Leatherwood testified that Mr. Jarrett had a gambling problem, that he had a bookie, that he carried a gun, that he threw eggs at people, and that he had a temper. So this case boiled down to who the jury was going to believe, Mr. Leatherwood, that there was no such employment agreement with Mr. Jarrett or Mr. Jarrett. However, the court allowed, while excluding Mr. Leatherwood's prior conviction, allowed all of this, this inflammatory e-mail, these alleged threats, this throwing eggs at a car, just question upon question of improper character evidence to come in against Mr. Jarrett. What was the evidence that was kept out that the defense tried to put in about Jarrett's prior? Mr. Leatherwood's prior? Yes. It was a theft conviction. It was a 1981 theft conviction. And the court said, it's over 10 years old, it has nothing but prejudicial value. While Do we know any more about it except that it was for theft? We know it was for theft in Colorado in 1981, and that Mr. Leatherwood served two years of confinement as a result of that conviction. While the court summarily disallowed that evidence against the government's key witness, it allowed in just a tremendous amount of evidence concerning Mr. Jarrett. The lower court further limited Mr. Jarrett's cross-examination of Mr. Leatherwood. Mr. Leatherwood testified on direct examination that there was this employment agreement. I mean, he concedes that there was this AIDS test kit company and that it existed in 1993. When Mr. Jarrett tried to cross-examine him to show the continued existence  of the company, the lower court said that Mr. Jarrett was not allowed to cross-examine  And that was a cross-examination question because the lower court believed those questions went only to the company as it related in 1993 and failed to see that it was Mr. Jarrett's position that the company was continuing until 2002. Based on this, Mr. Jarrett was not allowed to show that there was this ongoing relationship. He wasn't allowed to cross-examine Mr. Leatherwood concerning additional monies Mr. Jarrett sent after 1994, which is when Mr. Leatherwood stated that the employment relationship broke off. He was not allowed to question him about subsequent investments of monies. Mr. Leatherwood had told the FBI that Mr. Jarrett's involvement in this test kit company was limited to money. The appellant was not allowed to cross-examine concerning articles of incorporation that Mr. Jarrett had established for this company to show that his involvement in the company was a big involvement, much more than just the investment of money. But the lower court excluded all of those questions. Appellant also tried to cross-examine concerning a booklet that had been provided for the company to show this ongoing company, but the lower court allowed it. During the testimony of Mr. Leatherwood, every defense objection was overruled and every government objection was sustained. The lower court severely limited the cross-examination, allowed in this character evidence, and excluded every piece of defense evidence. Even with this serious slant against the defense, the jury was still not initially unanimous. I don't think it's fair to say that given, if he would have been able to introduce this evidence of the employment contract, of a listing that when these corporate tax returns should have been paid and how much should have been paid, that this evidence would not have affected this already divided jury. If the Court has any more questions? Roberts. What was the history in terms of the jury hanging up and then eventually reaching a verdict? The jury initially came back 10-2. Of course, they didn't state how it went. They were given an Allen charge and subsequently came back. Ms. Quinlan. How long before they came back 10-2 and how much longer after the Allen charge? They were both fairly quick. I mean, the entire trial lasted two days, I believe. I think they came back the same afternoon. I don't know exactly how much time it was. Of the second day? Or would that be into the third day? I believe it was into the third day. Ms. Quinlan, was there any testimony about books or lectures that Mr. Jarrah might have read or gone to by, for want of a better term, I'll call tax protesters? This type of thing of, you know, asking for refunds based upon alleged payment is fairly common, as you know, as an end quote scheme. Was there any testimony at all in the trial to that effect, that he had attended a lecture or had read a book about this sort of thing? No. There was no evidence concerning that. In fact, Mr. Jarrah, the evidence showed that Mr. Jarrah had for years worked as a tax preparer. So this was his profession. He prepared taxes for a living. He certainly had nothing against taxes or, you know, was some kind of conscientiously failing to pay or trying to get money from the government, that this was his job. Was he an enrolled agent with the IRS? I'm sorry? Was he an enrolled agent with the IRS? I don't believe so. He had a CPA license out of Colorado, I believe. So he had a higher level of understanding than, say, the average person. Certainly, it was he had an awareness, which I think goes to show that he certainly didn't think, oh, I can just put any number I want in a tax return and I know the government is going to come back and give me millions and millions of dollars. I mean, he knew how the system worked. He knew what the checks were. He knew how it would be scrutinized. He knew that when he prepared these corporate tax returns, based on his belief this money had been withheld, it was paid to the general corporation. If the Court has no more questions, I'd like to reserve. You may reserve your time, Counsel. We'll hear from the government. May it please the Court. Assistant United States Attorney Darwin Thomas for the government. Your Honors, I'd first like to address the question about the exclusion, particularly of the contract, since that Exhibit 101 was probably the only significant piece of evidence that was excluded. That confused me. You already know that I have the same problem with this case as the last one. I can't see why the jury doesn't get to decide the case on all the evidence. And on the contracts, I couldn't understand the ground. It's not a contract dispute where somebody may argue substitution of pages or formation of the contract was never accomplished. There wasn't offer and acceptance. You just didn't have any issues where authentication mattered. All that mattered was whether Jarrah believed he had a contract. Well, Your Honor, that particular document had a great deal of material in it, including a very specific number that was used when the tax returns were prepared. It was dated in the year 2002. It clearly was a very significant item that would have buttressed the testimony that Defendant Jarrah was giving. However, I believe that contract was correctly excluded, although I don't believe that the issue was particularly well handled at the time of the trial. It was excluded on best evidence grounds? Is that correct? It was excluded for lack of authentication is my understanding. And I would point out that while the Court seemed to focus upon where's the original and we can't have a copy, I recognize that a photocopy is admissible, much the same as an original. However, there is an exception there, one of which is that if there is a serious question raised as to the authenticity of the document. And the testimony in this case was that by the Defendant that he had signed the contract and sent it to Mr. Leatherwood, who would then forward it on to Mr. Mandeville somewhere else in the world for Mr. Mandeville's signature. He was then — it was then returned to him, apparently, through Mr. Leatherwood again. But the issue — Well, was the issue whether these signatures were indeed on the contract? The issue was whether or not the contract had actually been executed by this man named Mandeville. And Mr. Leatherwood had testified that he had no contact with the Defendant during this period of time, any time after the year 2000. And in the excerpts of record on page 437 is where the Defendant said that he had addressed the contract to Mr. Leatherwood for Mr. Leatherwood to pass on to Mr. Mandeville, and Mr. Leatherwood had then returned to him this photocopy of the contract. That seriously brought into question the authenticity of this signature by Mr. Mandeville on the contract. What was Leatherwood's testimony with respect to the contract? Well, I don't know that he addressed the contract specifically. His testimony was that he had absolutely nothing to do with Mr. Leatherwood. He had no contact at all, which presumes that that was the case. Beyond the year 2000. And he never would have received that contract. No. Correct. Which goes to the purpose of the best evidence rule when you have these kinds of issues. Yes. And I don't believe that the discussion in the record by the Court is really the most illuminating on this particular issue. But this particular document, the contract, would have been a very important document for the defense of the Defendant. I think that most of the rest of the exhibits were excluded. If it was totally fabricated, which may well be the case, why wouldn't that just be a matter for impeachment of Jarrah's credibility on Cross after he testified, look, here's the deal that I signed and sent to Leatherman. And Leatherman says, I had no contact with this guy at all. He didn't send this to me. It was all made up. And then the Cross of Leatherman, the Cross of Jarrah, enables the jury to decide which one's lying. Well, I understand that, Your Honor. But the contents of that contract is something that the government did not feel should be in the hands of the jury. The contents of this one-page document, which specifically lists out the amount of taxes that were listed on the tax returns that were filed. And we feel that that type of evidence, because it's a document in the hands of the government, which was inappropriate. Well, I can see why the government would prefer not to have evidence before the jury that would lend any credibility to the defendant's story. But that usually isn't the test. We usually don't just defer to the government's preferences in deciding these cases. Well, correct, Your Honor. But the government raised a valid objection to the admission of that document, and I believe that it was correctly excluded from evidence. Counsel, I don't understand the theory under which 105 was excluded. Now, that was allegedly the return he intended to file. Apparently, it was excluded on the basis that it was not the return as filed. That doesn't track with me. Well, and that's correct, Your Honor. There's also the exhibits, I believe, 106 and 107. These were all apparently claimed to be other pro forma tax returns on the computer of the defendant. But they're not an issue here because they were never offered, right? Correct. 106 and 107 were not. 105 adds nothing to the defendant's testimony. Now, whether it should have been admitted is another issue. The — but the exclusion. Well, the issue for me is why it should have been excluded. It was offered. It was not offered as the return as filed. It was offered as the return he intended to file but didn't. I mean, there's — I don't understand any objection to that. Again, as to admissibility. I understand Your Honor's question. I do not have an answer to it. I believe that the document could have been admitted, certainly, without error. The point that I wish to make is that there was no prejudice to the defendant by the failure to admit that document because the defendant had already testified that he had made a mistake and he had another return that was one that should have been filed. I don't see why that eliminates the prejudice. Juries often are very skeptical of what people say to them when they have an interest in lying to them. But if they see documentary evidence or photographs or any kind of corroboration, then they may say, well, maybe the guy's telling the truth. Well, yes, and that's just the point that I made to Your Honor just a moment ago. The fact is, though, there's nobody to authenticate anything about that document other than the defendant himself. And he had already said this is what I should have filed and this is what I meant to have filed. But the ---- What's the matter with that? Pardon me? He doesn't need the government to authenticate the document. If he's got a document that tends to show he's telling the truth, well, why wouldn't the jury get to see it? And then if the government wants to persuade the jury he made it all up or fabricated it afterwards or whatever, well, they can do that. Yes, Your Honor, and I'm admitting that I am at a deficiency here to argue persuasively that this document should not have been admitted into evidence. However, what I'm pointing out is that it really adds absolutely nothing to the testimony that he already gave. Much like this schedule of payroll taxes that he said he sent to Mr. Leatherwood that he did not have the original of. And I believe that that was Exhibit 110. These are nothing more than documents that the defendant said he created and they are the same as his testimony. It doesn't really add anything to his testimony. I believe that the evidence that Your Honor pointed out initially to opposing counsel regarding the facts in this case are so persuasive in terms of this was a scheme that was orchestrated by the defendant that his explanations for just create a bunch of confusion. They're inherently inconsistent. If he had known there was an error, he surely would have figured that out on February 21st, three weeks after he filed the claim for the refund when he called the IRS and asked that what had happened to his $3 million that he was expecting to have wired to his account. And the person who took that call testified that one of the verification procedures that they use when they receive these hotline phone calls inquiring about refunds is the amount of the refund. So it is clear that Mr. Jarrah called the IRS on February 21st of 2003 and asked where is my $2.9 million that should be wired to my bank account. Clearly, if there was a mistake, he would have known at that point that there was something wrong. He admitted at trial that this $7.2 million gambling loss that he claimed was erroneous. That was false. What did he say about this amazing phone call? What did Mr. Jarrah say about this amazing phone call? He said that he, as I recall, he did say that he made the phone call, that he was asked certain questions, and that he was asked about the refund, although perhaps not the exact amount of the refund. Now, this is his testimony. The testimony of Mr. Krell, who was the one who took that phone call, was essentially consistent. And the What I mean is, did Jarrah admit that he called the IRS and said where is my $2.9 million? He admitted that he called the IRS. He did not admit on the stand that he said where is my $2.9 million. And what did he say he called the IRS about? Well, he called the IRS to find out where his refund was, but he did not specify the amount when he testified. I get it. Thanks. Is it correct to state, counsel, that as far as the government is concerned, this is a guy, in terms of what clearly was done, filed a tax return claiming that he was entitled to three plus million dollars worth of refund, that the exclusion of evidence is basically just little fly flecks on the side? There's really nothing that would bear upon the ultimate truth of this that a false tax return was filed. There was an attempt to get that much money. Is that essentially the government's position? Yes, Your Honor. That is truly it. And I don't believe that most of the evidence that was excluded really would change much of anything at all. The fact is it was a rather cleverly designed scheme in which at the very beginning of the year in January, he filed two corporate payroll tax returns to buttress the claim which showed that this corporation which he controlled had withheld all this money, which in fact it had not. He then followed through with a tax return which reported this $10 million of income because you have to have the $10 million of income in order to have the $3.8 million of withholding. And in fact, if that had been the end of it, he probably would have been due little or no refund. But instead, he included a false Schedule C which claimed that he had a gambling loss of $7.2 million, thereby offsetting this income and providing a huge refund which he asked to have wired to his account. I think the evidence on this matter is very, very clear, very persuasive. I hesitate to call it overwhelming, but it certainly borders on overwhelming evidence that this was a blatant scheme by the defendant to extract $3 million out of the U.S. treasury and have it wired to his bank account. Was there any evidence introduced that suggested there was an intent to flee the United States or do anything with the money if he got it? No, no evidence regarding an intent to flee. However, the evidence regarding where he lived and how you could get in touch with him was very sketchy. When his wife was contacted, she asserted that they were not on good terms. This was, we asked if it was in June of 2003, and she said she couldn't exactly remember when it was. But it certainly allows the inference that it preceded the amended returns and the coming clean of the defendant. In trying to find him, the agents were unable to locate an address for him, and she said she had no knowledge where he was. It turned out later that she was his landlord and was renting an apartment or a home to him in Las Vegas. So it shows a contrivance to fly below the radar and sort of be hard to find. So could you explain again the scheme with the corporate returns and the personal return and the gambling losses? I want to make sure I understand it. The corporate returns filed. The corporate return says they paid him a salary of so and such, such and such an amount, and withheld on the federal withholding taxes and social security taxes such and such an amount? Correct. Now, the details for an individual employee are set forth on a W-2 form, which he provided to himself. The payroll tax returns are summary for the corporation for all of its employees. However, this corporation only had one employee, and the amount that it paid this employee all within the fourth quarter of 2002 was represented to be the exact amount that he then reported as wage income on his tax return, his personal tax return. And as I said earlier, the tax that was... The corporation falsely says we paid Jarrah millions of dollars. Well, $9.985 million, and we... And Jarrah falsely reports on his personal return they paid me those millions of dollars. Correct. Which, in tax consequences, would not help Jarrah. Well, no, it wouldn't, because the $3.8 million that was withheld from this $10 million would just about cover the tax that he would owe on that $10 million. What he needs now is something else to show he was overwithheld. A $7.2 million gambling loss, which he admitted on the stand was a false form. The $7.2 million gambling loss, then, is the critical falsehood. Correct. That, along with the fact that $3.8 million was never withheld and paid over to the IRS. And somebody who has 25 years of experience in preparing tax returns has probably learned that the IRS is not always able to associate a person's claim for refund with monies that were actually paid into the U.S. Treasury. There was also no evidence, I believe your opposing counsel indicated, that would verify, at least documentary evidence, that would verify that $10 million had been paid. There were no checks that were produced. None. He did not even keep copies of the checks that he alleged he received, endorsed, and forwarded on to Mr. Leatherwood. My co-counsel went over all of these materials with him, no fax receipts, no telephone records, no photocopies, no anything, to verify that this money ever existed. I am tempted to address the- Could you help me with something else? It's a funny scheme because when he falsely reports that he received a whole lot more income than he did, vastly more income than he did, that's a funny little twitch in a tax fraud scheme. It's a very clever approach. Usually what people say is, I didn't earn nearly as much as I really did. Yes. So the only way he makes money out of it is with the ridiculous gambling loss claim. Correct, Your Honor. That's correct. Is there some further explanation for why the corporate returns are part of a criminal scheme and not just crazy fantasy? Well, they were filed to buttress the claim that he had actually received the income and that the income tax was withheld. In fact, Your Honor, if- That does him no good. If an employer withholds money from an employee's wages and fails to pay it over to the government, the employee is still given credit for the income tax withholding. So if your employer makes off with the income tax that they withhold from your wages rather than pay it over to the government, an employee will still get credit for it. And that's part and parcel of how this scheme was supposed to work. But if you admit that you got the income, even though you didn't, it sort of takes away the benefit of the phony W-2. Yes. Was he sentenced based upon filing false tax returns? He was, wasn't he? Yes. The conviction in this case is for subscribing to false income tax returns. All right. So whether it made any sense that he would have done something, the fact is he filed these assigned under penalty of perjury, the false tax returns, and was sentenced for that. And he subscribed each tax return and filed each tax return with the IRS. With respect to the alleged improper character evidence, which I will tell the Court, concerns me as well, I don't believe that there is significant prejudice with regard to some sort of conclusion by a jury that because the man had some anger problems that he therefore was tax cheated. Wait a minute. I'm not sure I understand that. You show a jury that a guy arms himself with eggs when he drives on the freeway so that he can throw eggs at cars and arms himself with a gun just in case any of the drivers of the cars decide to do something about it. I would think a lot of jurors would think, I don't care what this guy did, he belongs in a cage. That's – I understand Your Honor's point, and I'm addressing this point in order to say that I did have some concerns about that because – but the question itself was really not objectionable. The answer may have been improper. And there was no motion made to strike that material from the record. So I see no time. Thank you, counsel. Your time has expired. Ms. Quinn, you have some reserve time. Ms. Quinn, could I just ask you as a start, because I know you probably have other things you want to specifically focus on, there were a number of issues raised in your appeal which have not been addressed here, specifically the denial of the request, the motion for the change of venue, the abuse of discretion on your motion in limine to admit the 25-year-old theft conviction of Richard Leatherwood, the exclusion of the juror because the juror didn't understand English. Has all that gone now, or are you still raising those arguments? Certainly, we contended those in our appeal, and we still believe they are viable arguments. They were addressed in your brief. And they were addressed in the brief. I think that there were a lot of issues in this trial that went against Mr. Jarrett that sort of showed that this was not a fair trial. I mean, I heard the Court mentioning, well, the government has a lot of evidence, and this defense evidence is just kind of out there, but every defendant is entitled to a fair trial. Every defendant is entitled to confront and cross-examination. Every defendant is entitled to bring in evidence. And whether or not all of this evidence, every piece of defense evidence, if any of it would have been admitted, would have changed this jury's mind, I think is a significant issue. When you have a trial where every defense objection is overruled and all of the government's objections are sustained, and the government gets to bring in all of this irrelevant prejudicial character evidence, and the defendants' cross-examinations are limited, and the evidence, every piece of defense evidence is excluded, I don't see in this case that we even had the semblance of a fair trial. I believe this Court made its mind up, and he acted accordingly. He did not look at this venue motion and sit there and consider that this corporation was in Nevada and counsel was in Nevada and Mr. Jarrett was in Nevada. The Court just summarily denied the motion. Kennedy. Counsel, we're going to go issue by issue determining each one of those that you have preserved and raised here, either in the brief or an oral argument. What is the most crucial issue that you'd like to leave with us that would compel a reversal from your point of view? Well, I would have to say it's the exclusion of every piece of defense evidence. I mean, you can't. The exhibits. All of the exhibits. You can't have a case where you don't allow the defense to put on their case, to tell their side of the story. We were speaking of Exhibit 101, which was the employment agreement, and we can come up here now and say, well, maybe this would have excluded it, maybe that would have excluded it. But that's not what happened in the lower court. Judge Reel specifically said, this original has not been accounted for. I'm not going to let this evidence in based on that. Judge Reel, very specifically in the record, had the wrong understanding of the best evidence rule, and he specifically excluded evidence based upon his misunderstanding. What about Mr. Thomas's point that there was a significant issue as to authenticity? Well, I think that wasn't the issue. There was not this discussion in the lower court as to whether or not this document was authentic. There was not all of these questions to Mr. Jarrett to establish, to really be able to establish authenticity. There wasn't these questions about whether he could really establish if he knew the signature, when he made this document and where it was. The court said, the original has not been accounted for and we're going to exclude it. Now saying authenticity may have been an issue, we don't know because we weren't allowed to address that in the lower court. In fact, there was a contention or evidence that two out of the three parties never signed this document. Isn't that enough? Well, the government never called Mr. Mandeville. So, you know, they could have. They didn't. They didn't have his testimony as to whether or not he signed it. They had Mr. Jarrett's testimony that he signed it and that he made a copy of that. And that's what was tried to be admitted. But Leatherwood apparently testified that he never had any contact with Jarrett at that point, which presumably means that he couldn't possibly have signed this agreement. That's correct. Leatherwood was not a party to it. He didn't sign it. But there was testimony from, of course, Mr. Jarrett saying that there was this ongoing relationship. They also called in a third person, Ms. Tindall, I don't know if I'm saying her name right, who testified that she heard a conversation post-1995 between Mr. Leatherwood and Mr. Jarrett. So there was evidence from other persons that there was contact. It meets the requirements, even if Mr. Jarrett would have been allowed to try to authenticate it. He could have met the requirements of 901. Now, whether or not what weight should have been given could have been something that could have been argued to the jury by the government, but the admissibility would have come in under 901 based on his testimony that he's a person with knowledge and the thing is what it purports to be. Counsel, your time has expired. Thank you. Thank you. The case just argued will be submitted for decision, and the Court will adjourn. All rise.
judges: O'scannlain, Kleinfeld, Smtih